# ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | Civil Action No. _____ |
| Plaintiff, : | |
| : | |
| v. : | |
| : | United States |
| **INTEGRATED ELECTRICAL SERVICES, INC.,** : | Southern ... of Texas |
| **HERBERT R. ALLEN, RICHARD L. CHINA,** : | |
| **THOMAS E. STALVEY, ERNEST P. BREAUX,** : | AUG 2 9 2007 |
| **JAMES M. CALCOTE, and J. CARL CANNON,** : | |
| : | Michael N. Milby, Clerk |
| Defendants. : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## INTRODUCTION

1.      This case involves material disclosure and accounting lapses at Integrated Electrical Services, Inc. ("IES" or the "Company"), an electrical holding company based in Houston, Texas.   These lapses center on the Company's failure to disclose material loss contingencies related to its accounts receivable from at least its fiscal third quarter 2003 through its fiscal second quarter 2004.  IES also failed to appropriately reserve for these material loss contingencies relating to its accounts receivable, and even materially lowered its allowance for doubtful accounts during this same period without proper disclosure.

2.      The loss contingencies surrounding IES's accounts receivable comprise approximately $3 million in revenues recorded on unsigned change orders from two electrical construction contracts at Pan American Electric, Inc. ("Pan Am"), an IES subsidiary.  In 2001

and 2002, Pan Am recorded this revenue pursuant to change orders that arose in the normal course of two contracts.  By the summer of 2003, after both contracts had been completed, officers at Pan Am and IES knew that the relevant change orders were disputed by the general contractors.

3.     After it was clear that these change orders were in dispute, IES attempted, and failed, to collect the approximately $3 million for over a year.  During this time, however, IES neither disclosed the disputed change orders in the footnotes to its financial statements, nor reserved against the accounts receivable.  Thus, IES failed to properly evaluate, disclose, and reserve for the disputed change orders in accordance with Generally Accepted Accounting Principles ("GAAP").

4.     IES exacerbated the above situation by materially lowering its allowance for doubtful accounts by approximately $1.85 million. This reduction took place over three consecutive quarters during the relevant time period, and provided a dollar-for-dollar increase to IES's bottom-line income.  Although reductions of this nature are permitted by GAAP, this change in estimate was not properly disclosed.

5.     In the interest of protecting the public from any further violations of the federal securities laws, the Commission brings this civil securities law enforcement action seeking permanent injunctive relief against IES, Herbert R. Allen, Ernest P. Breaux, James M. Calcote, J. Carl Cannon, Richard L. China, and Thomas E. Stalvey.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa].

7.      Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

8.      Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because IES is headquartered in Houston, Texas, and certain of the acts and transactions described herein took place in Houston.

## DEFENDANTS

9.      **IES** is a Delaware corporation headquartered in Houston, Texas.  During the relevant time period, IES was a leading provider of electrical contracting services in the United States, whose shares were traded on the New York Stock Exchange and registered with the Commission under Section 12(b) of the Exchange Act.  IES is on a September 30 fiscal year end. On December 15, 2005, the NYSE suspended trading of IES stock for failing to maintain a $1 per share trading price. On February 14, 2006, IES filed for Chapter 11 bankruptcy protection in the U.S. Federal Court for the Northern District of Texas.  IES emerged from bankruptcy in May 2006, applied and is currently listed on the NASDAQ.

10.     **Herbert R. Allen,** age 66, is a resident of Sullivans Island, South Carolina. During the relevant time period, Allen was IES's President and Chief Executive Officer and IES's acting Chief Financial Officer for a brief period.  Allen served as IES's President and Chief Executive Officer from October 2001 through June 2005, and as IES's Chief Financial Officer from March 2004 through June 2004 and from September 2004 through October 2004.

11.     **Richard Louis China,** age 48, is a resident of Stevenville, Maryland.  During the relevant time period, China was IES's Chief Operations Officer.

12.     **Thomas Earl Stalvey, Sr.**, age 60, is a resident of Valdosta, Georgia. During the relevant time period, Stalvey was a Regional Operating Officer of IES until September 2003, when he took over as President of an ACE Electric, an IES subsidiary.

13.     **Ernest P. Breaux, Jr.**, age 62, is a resident of New Iberia, Louisiana. During the relevant time period, Breaux was a Regional Operating Officer of IES, taking over as Regional Operating Officer for Pan Am's region during a re-organization in August of 2003.

14.     **James M. Calcote, Jr.**, age 39, is a resident of Carriere, Mississippi. During the relevant time period, Calcote was a Regional Controller of IES, taking over as Regional Controller for Pan Am's region during a re-organization in August of 2003. Calcote is a licensed CPA in the State of Mississippi.

15.     **James Carl Cannon**, age 58, is a resident of Hermitage, Tennessee. During the relevant time period, Cannon was President of IES subsidiary Pan Am, a position he assumed in May 2003.

## FACTS

16.     IES is an electrical holding company based in Houston, Texas, and a leading provider of electrical contracting services in the United States. Founded in 1997 through the combination of 16 privately owned electrical companies, IES went public a year later in 1998. During the relevant time period, IES, through over 50 subsidiaries and 11,000 employees, provided a broad range of electrical and communication services to residential and commercial markets.

17.     IES enters into contracts principally on the basis of competitive bids. Most contracts are made on a fixed-price basis, whereby the Company agrees to do specified work for a fixed dollar amount. IES also performs work on a cost-plus basis, whereby contracts are

performed for actual costs plus an agreed-upon profit. IES recognizes revenues from most of its construction contracts on a percentage-of-completion basis, measured principally by the percentage of costs incurred to date to the estimated total cost of the contract.

18.     During the course of a contract, it is not unusual for additional work to arise that was unforeseen when the contract was signed. A sub-contractor like IES can recoup the costs for doing this additional work by issuing a "change order" to the customer with the approval of the general contractor. Rather than stopping work to have the sub-contractor and the customer sign a change order, the sub-contractor often performs work based on an "unsigned" change order, and follows up with the necessary paperwork and signatures at a later date.

19.     Revenue can be recognized for costs incurred for work performed pursuant to an unsigned change order if collection is deemed "probable." However, GAAP states that a *disputed* change order should be evaluated as a "claim" against the customer, which requires compliance with certain criteria before revenues can be recognized. Moreover, if a material amount of "claim" revenue is recognized, it should be disclosed in the footnotes to the financial statements.

20.     IES also is required to disclose and/or accrue for material loss contingencies for uncollectible accounts receivable. According to GAAP, disclosure of loss contingencies should be made when the likelihood of loss is probable or reasonably possible and whether or not the loss is reasonably estimable.

21.     During the relevant period, IES's reporting structure was aligned such that regional controllers and subsidiary controllers reported directly to the operations side of the Company, not the accounting side of the Company.

### A.      Disputed Change Orders

22.      In 2000, one of IES's largest subsidiaries, Pan Am, began work on two large commercial electrical construction contracts in Tennessee and Florida.

23.      In February 2000, Pan Am contracted with Centex Rodgers, Inc. ("Centex") for electrical work on construction of the Vanderbilt University Medical Center.   Pan Am was a sub-contractor for $5.5 million of work on a medical building at Vanderbilt University in Nashville, Tennessee.   Pan Am started this job (hereinafter "Vanderbilt") in March 2000 and finished in November 2002.   From November 2001 to November 2002, Pan Am booked approximately $1.7 million in revenue from unsigned change orders on the Vanderbilt job.

24.      In June 2000, Pan Am contracted with Skanska USA Building, Inc., f/k/a Beers Construction Company, Inc. ("Skanska") for work on construction of the Bay Medical Center Surgery/ER unit in Panama City, Florida.   Pan Am was a sub-contractor for $1.7 million of electrical work on a surgery center at Bay Medical Center in Florida.   Pan Am started this job (hereinafter "Bay Medical") in June 2000 and finished in approximately December 2002.   From September 2001 to September 2002, Pan Am booked approximately $1.3 million in revenue from unsigned change orders on the Bay Medical job.

25.      In April 2002, during a routine follow-up visit to Pan Am, IES Internal Audit flagged the Vanderbilt and Bay Medical unsigned change orders as large underbillings that should be monitored.   IES Internal Audit also noted that future developments may require that a portion of these underbillings be reserved.

26.      Following Internal Audit's April 2002 follow-up site visit, IES corporate and regional management closely monitored Pan Am's underbillings.   Specifically, the Vanderbilt and Bay Medical change orders were discussed at regional meetings where Allen, China, Stalvey

and others were present, and through correspondence among them.  Pan Am management continued to represent that Pan Am would collect on the Vanderbilt and Bay Medical change orders.

27.    On June 26, 2002, Cannon, as vice president for Pan Am, sent a letter to Skanska requesting payment for change orders on the Bay Medical project totaling approximately $880,000. Skanska rejected almost the entire request stating "there is simply nothing of substance to evaluate" with regard to Pan Am's claims.  Two months later, in August 2002, Pan Am sent a second letter to Skanska requesting payment on change orders now totaling approximately $1.3 million.  Of this approximately $400,000 in additional costs, only $9,000 was added for specific work completed by Pan Am, with the remainder relating to additional costs for Loss Efficiency, Extended Field Overtime, and Unabsorbed Home Office Overhead.

28.    In September 2002, Ernst & Young, LLP ("E&Y") conducted an external audit of Pan Am.  E&Y reviewed the Vanderbilt and Bay Medical projects as part of its normal testing, including a review of an unsigned, unapproved interim change order request that encompassed several individual change orders.

29.    Prior to E&Y's audit, the IES regional controller for Pan Am's region reviewed the Vanderbilt and Bay Medical change orders.  In a September 20, 2002 email to Stalvey, the regional controller wrote that he expected a recommendation from E&Y for reserving part or all of the underbillings on the Vanderbilt and Bay Medical projects because there was not enough supporting paperwork to deem the collectibility of the change orders "probable."

30.    Pan Am management, however, assured E&Y that the Vanderbilt and Bay Medical change orders would be collected.   Based in part on Pan Am management's

representations, E&Y did not recommend disclosure or reserving against the previously recognized revenues.

31.     On October 10, 2002, Pan Am submitted an interim change order request in the amount of approximately $1.7 million to Centex for work performed on the Vanderbilt project. Of the $1.7 million requested for payment, approximately $1.4 million represented claims for accelerated overtime and lost production. Shortly thereafter, Pan Am submitted a revised request for approximately $36,000 in additional charges.

32.     Over the next several months, IES corporate and regional management, which included Allen, China, Stalvey and others, scrutinized Pan Am's poor financial performance by, among other things, conducting regular site visits and monitoring calls. After a December 2002 visit to Pan Am, China sent Pan Am's president a "to-do" list, which included collecting payment on the Vanderbilt change orders by the end of January, as well as pursuing the "pre-claim" filed with Skanska on the Bay Medical claim. If the Bay Medical claim was not resolved by January 15th, China instructed Pan Am to formally file suit against Skanska. By the end of 2002, Allen, China, and Stalvey were each aware of the salient issues surrounding the Vanderbilt and Bay Medical change orders, but were told by Pan Am management that the change orders would be collected.

33.     On January 31, 2003, Pan Am received a response to its second request for payment on the Bay Medical unsigned change orders. In its response, Skanska either disputed Pan Am's requests or sought additional information and consideration from Pan Am.

34.     Shortly thereafter, in February 2003, Stalvey and China reprimanded Pan Am's president for his and Pan Am's poor performance, which included the failure to collect on the Vanderbilt and Bay Medical outstanding change order requests. In fact, Pan Am did not even

bill the Vanderbilt change orders to Centex until March 2003. Shortly thereafter, Pam Am's president resigned.

35.     While preparing Pan Am's financial package for the quarter ended March 31, 2003, the Pan Am's regional controller spoke to China and Stalvey about his desire to reserve for the Vanderbilt and Bay Medical receivables. Up to this point, Pan Am's president had consistently told China that Pan Am would collect the Vanderbilt and Bay Medical receivables, and China had not seen sufficient evidence to the contrary. As a result, China, instructed Pan Am's regional controller not to reserve for Vanderbilt and Bay Medical.

36.     Pan Am's regional controller was not comfortable with China's decision and called IES's corporate accounting department to discuss his concerns. The regional controller was informed that Pan Am did not need to specifically reserve for the Vanderbilt and Bay Medical receivables because IES's corporate-wide bad debt reserves would cover any unexpected exposure if collection efforts failed.

### *IES's Third Quarter 2003*

37.     In IES's third fiscal quarter 2003, significant events occurred to impact the Vanderbilt and Bay Medical change order requests, which left no doubt that these two receivables were in dispute.

38.     In April 2003, Pan Am initiated litigation against Skanska in state court in an attempt to collect the approximately $1.3 million in previously recorded revenue from the unsigned change orders. From that point forward, Pan Am and IES should have evaluated the Bay Medical receivable as a claim as required by GAAP and as set forth in AICPA Statement of Position 81-1 ("SOP 81-1"), which required IES to disclose the disputed change orders in the

footnotes to its financial statements. IES also should have established a reserve against the doubtful receivable as required by FAS 5. However, IES did neither.

39. In May 2003, IES senior management selected Cannon as the new president of Pan Am. Prior to his promotion from vice-president of construction services to president, Cannon had participated in numerous management meetings at Pan Am where the Vanderbilt and Bay Medical projects were discussed, and therefore was aware of the issues surrounding the receivables when he took over.

40. In June 2003, Stalvey met with Centex to discuss the status of the Vanderbilt change order request and possibility of payment. No resolution on payment was reached during the meeting, so Stalvey asked Centex to officially respond to Pan Am's written request for payment of the outstanding change order requests.

41. On June 18, 2003, Centex sent a letter to Stalvey, with a copy to Cannon, responding to Pan Am's written request for payment on the Vanderbilt change orders ("June 18 letter"). Stalvey forwarded the June 18 letter to China the following day. In its response, Centex detailed the history of the negotiations, noted that Pan Am had waited until the project was substantially complete before alerting Centex to the existence of these change orders, and condemned the fact that Pan Am lacked necessary documentation for its claims. In particular, Centex took issue with Pan Am's claim for over $1.1 million in "lost production/overtime." Centex felt that Pan Am overstaffed the project, allowed excessive unmonitored breaks ("...the equivalent of a continual smoke break for 5 full time electricians"), and failed to provide the required supervision to manage such a complex project.

42. As a result, Centex took the position that Pan Am itself should be held responsible for any excess costs it incurred. Centex concluded its letter by stating, "[u]nless there is

something else to be provided by Pan Am…there does not seem to be adequate documentation for us to present or to recommend a change request to Vanderbilt on behalf of Pan Am."

43. Both the existence and tenor of the June 18, 2003 letter are significant. By June 19, 2003, senior officers at Pan Am and IES knew that Centex disputed the validity of the change orders and would not submit them to Vanderbilt University for payment without significant additional documentation – something Pan Am did not have, and never produced. From that point forward, Pan Am and IES should have evaluated the Vanderbilt receivable as a claim as required by GAAP and as set forth in SOP 81-1, which required IES to disclose the disputed change orders in the footnotes to its financial statements. IES also should have established a reserve against the doubtful receivable as required by FAS 5. However, IES did neither.

44. Even after meeting with Centex and reviewing the June 18 letter, Stalvey executed his regional certification for this period, certifying the accuracy of Pan Am's financials. Cannon, who also reviewed the June 18 letter, executed his subsidiary certification for this period.

45. On August 5, 2003, IES filed its Form 10-Q with the Commission for IES's third quarter ended June 30, 2003. The amount of the Vanderbilt and Bay Medical disputed change orders was material and comprised approximately 24% of IES's reported pre-tax income for this period. In this Form 10-Q, IES failed, in accordance with GAAP, to disclose in the footnotes of its financial statements that the Vanderbilt and Bay Medical change orders were in dispute. IES also failed to appropriately reserve for the disputed change orders in accordance with GAAP.

46. Despite being aware of the issues relating to the collection of the Vanderbilt and Bay Medical receivables at Pan Am, CEO Allen certified the accuracy of IES's financial statements for that period.

### IES's Fourth Quarter and Fiscal Year End 2003

47.     Throughout IES's fiscal fourth quarter 2003, the Vanderbilt and Bay Medical receivables were consistently an item of discussion at regional operating officer meetings at which Stalvey, China, and sometimes Allen were present.

48.     With respect to Vanderbilt, both Allen and China expressed concern over the collectibility of the change orders, but because they felt that the June 18 letter was simply part of the negotiation process, they felt the best strategy was to continue collection efforts with Centex.

49.     China then set out to collect information on all projects where Centex was the general contractor to potentially use as leverage against Centex in the Vanderbilt negotiations. Until this analysis was complete, China instructed Cannon to "sit" on the Vanderbilt receivable.

50.     Near the end of IES's fourth quarter and fiscal year end 2003, IES simplified its regional structure by restructuring its regional designations and replacing some of the regional managers. For Pan Am's new region, Breaux and Calcote took over as regional operating officer and regional controller, respectively. As part of the transition, Breaux and Calcote were brought up to speed on the issues at Pan Am, including the outstanding receivables on the Vanderbilt and Bay Medical projects. Yet, both Breaux and Calcote executed their regional certifications for the fiscal year end without reservation.

51.     In late September 2003, E&Y made a site visit to Pan Am in conjunction with its annual audit of IES. Somehow, E&Y was never provided with a copy of the June 18 letter from Centex that disputed Pan Am's unsigned change orders on the Vanderbilt project. The letter was "missing" from the Vanderbilt project file, and neither Cannon, Stalvey nor China brought it to E&Y's attention.

52.     During E&Y's site visit to Pan Am, Cannon, even though he knew otherwise, represented to E&Y that the Vanderbilt receivable was a good claim and fully collectible.

53.     Despite Cannon's representations, E&Y identified Vanderbilt and Bay Medical as a concerns, and included the receivables in its "observation list" for further review.   The Vanderbilt and Bay Medical receivables were then reviewed in October 2003 in connection with IES's 2003 year-end audit.

54.     On October 27, 2003, E&Y sent an email to IES's Chief Accounting Officer (CAO).  The email stated that Pan Am was "in compliance with corporate policy regarding the general reserve," but noted that Pan Am did not have any specific reserves for the Vanderbilt and Bay Medical receivables and that those two receivables should be watched.  The CAO forwarded the email to Pan Am's former regional controller, asking him to provide some background on these claims.

55.     In an email response to the CAO, Pan Am's former regional controller stated that "Pan Am has a definite liability residing with the collection of the (2) claims.  Conservatively, I expect the write-down to be somewhere between $1 million and $1.5 million.  When I asked whether Pan Am would be allowed to reserve the 'proper' amount in 2003, I was told by more than one person that the (2) claims would be looked at from a corporate exposure…Pan Am reserved about 1.5% of the remaining receivables (including retainage) once the claims were excluded.  My point, back when it was my responsibility, was that even if the claims were viewed in a 'corporate' based totality, Pan Am would ultimately suffer the financial hit…"

56.     On October 31, 2003, Allen, IES's Chief Financial Officer, and the CAO executed a management representation letter to E&Y that portrayed the Vanderbilt receivable as fully collectible, and the relationship with Centex as favorable.  Based on the management

representation letter, Cannon's assurances, and its own review, E&Y concurred with IES's accounting treatment of the Vanderbilt and Bay Medical receivables. As a result, no disclosure was made, and no specific reserves were established.

57.     On November 26, 2003, IES filed its Form 10-K with the Commission for IES's fiscal year ended September 30, 2003. The amount of the Vanderbilt and Bay Medical disputed change orders was material and comprised approximately 26% of IES's reported pre-tax income for IES's forth quarter 2003 and approximately 7.5% for IES's fiscal year end 2003. In this Form 10-K, IES failed, in accordance with GAAP, to disclose in the footnotes of its financial statements that the Vanderbilt and Bay Medical change orders were in dispute. IES also failed to appropriately reserve for the disputed change orders in accordance with GAAP.

58.     Despite being aware of the issues relating to the collection of the Vanderbilt and Bay Medical receivables at Pan Am, CEO Allen certified the accuracy of IES's financial statements for that period.

### IES's First Quarter 2004

59.     Throughout IES's fiscal first quarter 2004, no movement was made by Pan Am in the collection efforts of the Vanderbilt or Bay Medical receivables. However, Cannon, Breaux, and Calcote each certified that Pan Am's financial statements were true and correct for the quarter ended December 31, 2003.

60.     On January 30, 2004, IES filed its Form 10-Q with the Commission for the quarter ended December 31, 2003. The amount of the Vanderbilt and Bay Medical disputed change orders was material and comprised approximately 27% of IES's reported pre-tax income for this period. In this Form 10-Q, IES failed, in accordance with GAAP, to disclose in the footnotes of its financial statements that the Vanderbilt and Bay Medical change orders were in

dispute. IES also failed to appropriately reserve for the disputed change orders in accordance with GAAP.

61.   Despite being aware of the issues relating to the collection of the Vanderbilt and Bay Medical receivables at Pan Am, CEO Allen certified the accuracy of IES's financial statements for that period.

### *IES's Second Quarter 2004*

62.   Throughout IES's fiscal second quarter 2004, the Vanderbilt and Bay Medical receivables continued to be a major topic of discussion among subsidiary, regional and corporate management.

63.   In a January 2004 email, Cannon asked Breaux whether they could revisit the Vanderbilt receivable. Breaux forwarded the email to China, who set up a conference call for January 12, 2004 to discuss Vanderbilt. During this call, China, Breaux, and Cannon discussed the on-going collection efforts relating to the Vanderbilt receivable. China's position was that IES should continue to negotiate with Centex, and should not recognize a loss on the project unless there was no other alternative.

64.   In mid January 2004, Cannon attended a voluntary mediation between Skanska and Pan Am relating to the Bay Medical receivable. In an effort to get the issues resolved, Skanska offered approximately $850,000 to settle the $1.3 million claim, which was contingent on successful negotiations between Skanska and the customer, Bay Medical. However, Pan Am rejected this offer, and no further discussions or negotiations were had during IES's second quarter 2004.

65.    In February 2004, Pan Am hired a new controller. Soon thereafter, the new controller noticed Pan Am's large underbillings, and decided to organize and detail various jobs that accounted for these underbillings, which included the Vanderbilt and Bay Medical projects.

66.    In March 2004, the new Pan Am controller prepared and forwarded to Cannon, Breaux, and Calcote an underbilling schedule highlighting, among others, the Vanderbilt and Bay Medical receivables. The underbilling schedule noted that negotiations with Centex on collecting the Vanderbilt claim were not favorable, and that Pan Am expected to collect only $900,000 of the $1.3 million Bay Medical claim.

67.    Despite the continued concerns regarding the disputed Vanderbilt and Bay Medical receivables, Cannon, Breaux and Calcote each certified that Pan Am's financials were accurate for the quarter ended March 31, 2004.

68.    On April 30, 2004, IES filed its Form 10-Q with the Commission for the quarter ended March 31, 2004. The amount of the Vanderbilt and Bay Medical disputed change orders was material and comprised approximately 186% of IES's reported pre-tax income for this period. In this Form 10-Q, IES failed, in accordance with GAAP, to disclose in the footnotes of its financial statements that the Vanderbilt and Bay Medical change orders were in dispute. IES also failed to appropriately reserve for the disputed change orders in accordance with GAAP.

69.    Despite being aware of the issues relating to the collection of the Vanderbilt and Bay Medical receivables at Pan Am, Allen, as CEO and interim CFO, certified the accuracy of IES's financial statements for that period.

### Settlement and Write-Off of Vanderbilt and Bay Medical Claims

70.    In May 2004, IES settled the $1.7 million Vanderbilt claim for $35,000 and a commitment for future work from Centex. For 11 months after Centex sent Pan Am a letter

disputing the Vanderbilt claim, IES carried the full $1.7 million receivable on its books. During that time, no one at IES disclosed the claim in the footnotes of IES's financial statements, no one at Pan Am or IES established a reserve against income for the disputed account receivable, and Allen, Stalvey, Breaux, Calcote, and Cannon each signed their respective corporate, regional, or subsidiary certifications attesting to the accuracy of the financial statements.

71.     IES wrote off the remainder of the $1.7 million claim in June 2004, which the Company disclosed in a press release that was also filed with the Commission in a Form 8-K on June 22, 2004. In the release, IES revised its third quarter outlook by adjusting estimates downward $.03 per share due to the "write-off of a receivable related to one customer that was determined to be uncollectible in the quarter."

72.     The Bay Medical claim was not settled until January 2005 for approximately $810,000, an amount less than Skanska offered at mediation.

73.     With regard to the Vanderbilt and Bay Medical change orders, IES failed to (i) properly evaluate the disputed change orders as claims, (ii) disclose the disputed change orders in the footnotes of its financial statements, and (iii) establish a reserve for the disputed change orders.

**B.     <u>Allowance for Doubtful Accounts Reserve</u>**

74.     IES also failed to properly disclose changes in the basis for its doubtful accounts reserve. During the fourth quarter of 2003 and the first and second quarters of 2004, IES lowered its doubtful accounts reserve by $1.85 million. According to the Company, this change was made to bring its reserve more in line with the Company's historical collection trends. However, this change had the effect of increasing the Company's bottom-line pre-tax income.

75.     Specifically, during the quarters ended September 30, 2003, December 31, 2003, and March 31, 2004, IES changed the percentage basis for estimating the general portion of its uncollectible accounts receivable from approximately 1% down to 0.25%. This resulted in IES reducing its allowance for doubtful accounts and thereby increasing its pre-tax income by $550,000 for the quarter and fiscal year ended September 30, 2003, by $1.1 million for the quarter ended December 31, 2003, and by $200,000 for the quarter ended March 31, 2004. These reductions were material to IES's pre-tax income in each period comprising approximately 6.7%, 13.8%, and 17.4% of IES's reported pre-tax income for the quarters ended September 30, 2003, December 31, 2003, and March 31, 2004, respectively.

76.     IES did have a general disclosure stating that it carried an allowance for doubtful accounts. However, IES never disclosed to investors that it was changing the basis for its doubtful accounts reserve, and in fourth quarter of 2003, it failed to disclose the reduction in reserves. When IES again lowered its allowance for doubtful accounts in the first and second quarters of 2004, IES did reference a decrease in bad debt expense in the footnotes to its financial statements, but failed to explain the decreases.

## CLAIMS

**A.      Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder by Defendant IES**

77.     Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

78.     Defendant IES, in the manner set forth above, failed to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of

the Exchange Act and annual reports and quarterly reports as the Commission has prescribed, and to include in such reports all material information as necessary to make the required statements, in light of the circumstances, not misleading.

79.     By reason of the foregoing, IES violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder.  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## B. Violations of Sections 13(b)(2)(A) and 13b(2)(B) of the Exchange Act by Defendant IES

80.     Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

81.     Defendant IES, having a class of securities registered pursuant to Section 12 of the Exchange Act, in the manner set forth above, failed to:

(a)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets;

(b)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that —

(i)     transactions are executed in accordance with management's general or specific authorization;

(ii)    transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) to maintain accountability for assets;

(iii)   access to assets is permitted only in accordance with management's general or specific authorization; and

(iv)    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

82.     By reason of the foregoing, Defendant IES violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.  [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B)].

**C.      Aiding and Abetting IES's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder**

83.     Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

84.     Based on the conduct alleged herein, IES violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder.  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

85.     Defendants Allen, China, Stalvey, Breaux, Calcote and Cannon, acting alone or in concert with others, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to IES, as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

86.     By reason of the foregoing, Allen, China, Stalvey, Breaux, Calcote and Cannon aided and abetted IES's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

**D.      Aiding and Abetting IES's Violations of Exchange Act Section 13(b)(2)(A)**

87.     Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

88.    Based on the conduct alleged herein, IES violated Section 13(b)(2)(A) of the Exchange Act. [15 U.S.C. § 78m(b)(2)(A)]

89.    Defendants Allen, China, Stalvey, Breaux, Calcote, and Cannon, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to IES in connection with its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the true nature of the Vanderbilt and Bay Medical receivables.

90.    By reason of the foregoing, Allen, China, Stalvey, Breaux, Calcote, and Cannon aided and abetted IES's violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

**E.    Aiding and Abetting IES's Violations of Exchange Act Section 13(b)(2)(B)**

91.    Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

92.    Based on the conduct alleged herein, IES violated Section 13(b)(2)(B) of the Exchange Act. [15 U.S.C. § 778m(b)(2)(B)]

93.    Defendant China, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to IES in connection with its failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

94.    By reason of the foregoing, China aided and abetted IES's violation of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

**F.**   **Violations of Exchange Act Rule 13a-14**

95.   Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

96.   Section 13(a) of the Exchange Act requires that current and periodic reports filed with the Commission do not contain untrue statements of material fact or omit to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Exchange Act Rule 13a-14 requires the principal executive officer and the principal financial officer of the company to sign a certification that the report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

97.   By reason of the foregoing, Allen violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] in certifying IES's annual report on Form 10-K for the fiscal year ended September 30, 2003, and in certifying each of IES's quarterly reports on Form 10-Q for the quarters ended June 30, 2003, December 31, 2003, and March 31, 2004.

**G.**   **Violation of Exchange Act Rule 13b2-2**

98.   Paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

99.   As detailed above, Cannon represented to IES's external auditors that the Vanderbilt receivable was a good claim, and that Pan Am would collect the receivable in full, when he knew otherwise.  Accordingly, Cannon violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] by making, or causing to be made, materially false or misleading statements or omissions to an accountant or auditor.

## PRAYER

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a)    permanently enjoining IES from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

(b)    permanently enjoining Allen from violating Rule 13a-14 of the Exchange Act, and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder;

(c)    permanently enjoining Cannon from violating Rule 13b2-2 of the Exchange Act and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder;

(d)    permanently enjoining China from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

(e)    permanently enjoining Stalvey from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

(f)    permanently enjoining Breaux from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

(g)    permanently enjoining Calcote from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; and

(h)    granting such other relief as this Court may deem just or appropriate.

Dated: August 28, 2007

Respectfully submitted,

Jennifer D. Brandt
Attorney in Charge
Texas Bar No. 00796242
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
brandtj@sec.gov
(817) 978-6442
(817) 978-4927 (fax)
Attorney for Plaintiff